OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Grant M. Scott, filed September 25, 2007. On February 7, 2007, Scott was charged by way of complaint with aggravated menacing, in violation of. R.C. 2903.21(A), a misdemeanor of the first degree. Following a jury trial on July 26-27, 2007, in Dayton Municipal Court, Scott was convicted of *Page 2 
the lesser included offense of menacing, in violation of R.C. 2903.22, a misdemeanor of the fourth degree. Scott was sentenced to 30 days in the Montgomery County Jail, and the trial court suspended this sentence. Scott was ordered to serve 30 days of electronically monitored house arrest, with work release, and he also received a year of supervised probation and a year of unsupervised probation. Scott was further ordered to avoid contact with the victim and to attend anger management classes. Finally, Scott was ordered not to own or possess a firearm, and he was fined $250.00 plus costs.
 {¶ 2} The events giving rise to this matter began on February 6, 2007, at approximately 6:30 p.m. There had been a heavy snowfall that day and, according to the victim, Ruby Harris, she and some other family members spent over two hours clearing snow from the alley that runs behind the home of her invalid mother, Clover Hutchinson, at 1021 West Riverview Avenue. After shoveling, Harris prepared dinner for her mother while the other family members departed. Later, Harris went back outside to shovel snow from a walkway that runs from Clover's house to a parking pad at the rear of the property. As Harris reached the end of the walkway, she observed Scott in the alley with a snow shovel.
 {¶ 3} Scott resides at 331 Middle Street, and the alley behind his home is perpendicular to the alley behind Hutchinson's home, with Hutchinson's home being at the point of the alleys' intersection. According to Harris, Scott asked her why she was shoveling snow from the alley behind Hutchinson's home into the alley behind his home and into his driveway. Harris responded, "the good Lord piled that snow up in that alley and if you want to fuss at somebody you fuss at him." According to Harris, Scott stated, "If you weren't such a bitch I'd whip your god damn ass. I said, I'm not a bitch. I said[,] you are the bitch and you're not going to whip *Page 3 
my ass. * * * So then he said well your momma's a bitch. I said[,] your momma's a bitch. Then he said your grandma and your great grandma's a bitch. I said[,] your grandma and your great grandmother is a bitch. That's when he picked the shovel up like he's going to hit me or something. * * * I'm starting to back up some so I can get closer to my house because I wanted to run. He started digging in his pocket. * * * He's digging in his pocket and he keeps saying you don't know who the fuck I am do you? You don't know who the fuck I am. You don't know who you are fucking with. Then he pulls a gun out and he has it to his side like a little ways out but to his side. Now I'm really terrified and I don't know what to do. He said, you going to bleed. You don't care about bleeding in this god damn snow do you? You want to bleed in this snow? * * *" Harris described the gun as a "black automatic flat square gun." Harris testified that she was frightened, "thinking ok this man going to kill me." Harris testified that Scott fired one shot. She told him that she was going to call the police as she continued backing up toward the house. When Scott turned to walk away, Harris ran inside and dialed 911.
 {¶ 4} When Dayton Police Officers Timothy Gould and Andy Zecchini responded to the scene, Harris told them what happened and asked them to search the area for the shell casing. The officers were unable to locate the casing. After the officers left the scene, some of Harris' siblings returned to Hutchinson's home. As one of Harris' brothers later departed, he noticed a bullet casing in a tire track left in the snow by the officers' vehicle. Harris testified, "I looked at it and I said don't touch it. Go in the house and get a baggy. I called 911. I told them that there was the bullet and I took the baggy and I put it over it and covered it up. I handed it to the police when they came back." Harris testified that she did not touch the casing when she *Page 4 
retrieved it with the baggy, and that she showed the officers where the casing had been found.
 {¶ 5} Hutchinson testified that she heard one shot fired while Harris was outside, and she stated that the shot sounded like it came from the area behind her house by the parking pad. Hutchinson stated that she did not routinely hear gunfire in her neighborhood.
 {¶ 6} According to Scott, he had ongoing problems with Hutchinson's family regarding parking in the alleys and loud music. Scott testified that his wife, Rosa, was washing dishes in their kitchen when she advised him that a woman, who turned out to be Harris, was shoveling snow into piles in such a way that she was blocking the Scotts' egress from the alley running behind their home. Scott testified that he waited approximately 10 minutes, until Harris was gone, and then he proceeded outside with a snow shovel to remove a pile of snow blocking the alley. While Scott shoveled snow, Harris emerged from Hutchinson's home and again began to shovel snow in the direction of Scott's property. According to Scott, he said, "What are you doing? Why are you shoveling snow over here? Why do you people keep giving me problems?"
 {¶ 7} According to Scott, while he and Harris spoke, Harris raised her shovel at him, and he raised his in an effort to defend himself. Scott testified that he did not raise his voice, curse, threaten or fire a weapon in the course of the exchange. Scott testified that he does not own a gun. When Harris told Scott that she intended to call the police, Scott decided to return home and call the police as well. According to Scott, approximately 10 or 15 minutes later, officers responded, and Scott initially observed them in the alley with Harris. Moments later, Scott testified that the officers appeared at his door.
 {¶ 8} According to Scott, when the officers arrived, "they immediately had their guns *Page 5 
pulled. They said step outside of the house and keep your hands visible. I complied with them. I didn't know why they had guns pulled on me. They put handcuffs on me and at first they said where's the gun? I said, what gun? There is no gun. They said well we going to put you in the vehicle here and we are going to find out what happened. They searched me. They went through all my pockets." Scott stated his pockets contained only his wallet and keys.
 {¶ 9} Rosa testified that she observed Harris shoveling snow outside and told Scott, "they are going to block you in. They are shoveling snow across the alley." She stated that Scott went outside 10 minutes later, and that she did not hear yelling or a gun shot while he was outside. When Scott returned, he told Rosa that he had to call the police. Rosa stated that he was not angry but calm. Rosa stated she listens to her television "not so loud you could hear it from the outside the loudness. I could hear it if I move to the bathroom or somewhere else in the house I can hear the TV."
 {¶ 10} Officer Gould testified that when he responded to the scene, the alley behind Hutchinson's house appeared "as if it had just been shoveled. It was not completely clear of snow but it was down to a very fine little bit." Gould stated that Harris was outside when he arrived, and "she was very excited and talking very fast. She seemed kind of scared." Gould testified that the alley was well lit by a streetlight directly above the intersection of the two alleys. In the course of his investigation, Gould observed the alley behind Scott's home, noting that snow had not been piled there but rather "it was nice just like a crisp blanket in a field." Gould also observed that Scott's driveway "also appeared undisturbed. Like it was just freshly fallen snow. I didn't notice any footprints leading to the driveway or anywhere in the alley." Gould testified that the snow that had been shoveled by Hutchinson's family had been placed on *Page 6 
the same side of the alley as Hutchinson's house.
 {¶ 11} When the officers responded to Scott's home, Gould testified that Rosa answered the door. Gould asked if the officers could come inside, but he said "Mr. Scott just stepped out," and "since we weren't going to have the conversation in the house we had it in our cruiser." Scott told Gould "there had been an argument and that his neighbor had piled up some snow in his driveway and the alley. We drove back there and I showed him that his alley and the driveway was clear and told him that I didn't see any snow that had piled up. It looked like it was freshly fallen snow."
 {¶ 12} Scott told Gould that he did not have a firearm and that he had not threatened Harris. According to Gould, he and Zecchini conferred and decided to place Scott under arrest. Gould testified, "I believed that something had happened. After speaking with Mr. Scott and his statements and I could plainly see that there was no snow in the alley that was piled up or in the driveway I believed he wasn't being credible — that's why I placed him under arrest."
 {¶ 13} Gould stated he was dispatched to Hutchinson's home again at around 8:40 p.m., and at that time Harris gave the officers the spent bullet casing. According to Gould, "older casings will have some corrosion on them. They will be bent. A lot of time they will get stepped on or have dirt in them." The casing Harris provided "appeared as if it was a fresh casing." According to Gould, the casing was "sealed in a ziploc bag" when Harris handed it to him, and Harris "said that she basically wanted to make sure that if there's any evidence or fingerprints that she kept preserved so she put it in a ziploc baggy and she was handling it very carefully." Gould testified that he submitted the casing to the crime lab for fingerprint analysis, but he was unaware of any results. *Page 7 
 {¶ 14} On rebuttal, Gould denied having his gun drawn when he responded to Scott's home, and he testified that Scott was not handcuffed until after they had taken him to the alley and spoken with him there. Finally, Gould again testified that at the alleys' intersection, "it went from freshly shoveled snow to freshly fallen snow. There wasn't any piles of snow actually in the alley."
 {¶ 15} Scott asserts three assignments of error. His first assignment of error is as follows:
 {¶ 16} "THE VERDICT OF GUILTY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 17} According to Scott, the witnesses' testimony was conflicting. He argues that, while Harris testified that Scott pulled out a gun and fired a shot, Scott denied doing so and denied even owning a gun, and no gun was recovered. He further argues that Harris' and Gould's testimony regarding the shell casing was inconsistent such that one of them was being untruthful.
 {¶ 18} "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (Internal citations omitted). Only in exceptional cases, where the evidence `weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." State v. Dossett, Montgomery App. No. 20997,2006-Ohio-3367, ¶ 32. *Page 8 
 {¶ 19} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. State v.DeHass (1997), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 20} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict.State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 21} Having reviewed the entire record, weighed all of the evidence and all the reasonable inferences, and considered the credibility of the witnesses, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice such that Scott is entitled to a new trial. The jury clearly found Harris' testimony to be more credible than Scott's regarding Scott's conduct during the incident, rej ecting Scott's assertions that he did not curse at Harris, raise his shovel, possess a gun and fire a shot. Gould's testimony regarding Harris' frightened demeanor further corroborated Harris' testimony, as did Hutchinson's testimony that she heard a shot fired behind her home while Harris was outside. While no gun was recovered and the bullet casing was not linked to Scott, the jury could infer that the fresh casing Harris retrieved from behind Hutchinson's home and gave to Gould came from the gun Harris *Page 9 
described Scott firing. The jury could also infer that Scott abruptly stepped out of his home when officers arrived because he feared they would find his gun if they conversed inside. Finally, Scott and Rosa's credibility regarding the alleged piles of snow in the Scotts' driveway and in the alley behind their home was belied by Gould's testimony, which the jury clearly believed, that the snow in those areas was freshly fallen and undisturbed. We note that the jury verdict for menacing rather than aggravated menacing suggests that the jury may have rejected the notion that a gun was fired. However, the verbal threats and raised shovel satisfy the elements of menacing.
 {¶ 22} Regarding the shell casing, we do not find Harris' and Gould's testimony to be completely inconsistent, and we cannot conclude, as Scott argues, that one "of them is obviously being untruthful." Harris testified that she retrieved the casing with a baggie without touching it, and that she showed the officers where it had been found. Gould testified that the casing was in a baggie when Harris handed it to him.
 {¶ 23} Extending substantial deference to the jury's determinations regarding witness credibility, after a review of the entire record, we conclude that the verdict is not against the manifest weight of the evidence. Scott's first assignment of error is overruled.
 {¶ 24} Scott's second assignment of error is as follows:
 {¶ 25} "THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION."
 {¶ 26} "In reviewing a claim of insufficient evidence, `[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, *Page 10 
following Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781,61 L.Ed.2d 560; see, also, State v. Thompkins (1997), 78 Ohio St.3d 380,386, 678 N.E.2d 541." State v. McKnight, 107 Ohio St.3d 101, 112,837 N.E.2d 315, 2005-Ohio-6046, ¶ 70.
 {¶ 27} R.C. 2903.22(A) provides, "No person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person * * * ."
 {¶ 28} Having reviewed the evidence in a light most favorable to the State, we conclude that any rational juror could have found that the State proved the essential elements of menacing beyond a reasonable doubt. Harris testified that Scott swore at her and raised his shovel at her. She stated she believed that he was going to hit her, and she began to back up toward Hutchinson's house, hoping to run away. When Scott pulled out his gun, Harris stated she was terrified and afraid Scott would kill her. Scott told Harris she would bleed in the snow. As discussed above, Harris' testimony was corroborated by Hutchinson's and Gould's, while the credibility of Scott and Rosa was impugned. Any rational juror, if believing the testimony of Harris, Hutchinson and Gould, could have found that Scott knowingly caused Harris to believe that he would cause her physical harm, and Scott's conviction is accordingly supported by sufficient evidence. Scott's second assignment of error is overruled.
 {¶ 29} Scott's third assignment of error is as follows:
 {¶ 30} "INEFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 31} Scott argues that his counsel was ineffective for failing to move for a directed verdict, pursuant to Crim. R. 29, at the close of the State's case in chief and again at the close of the evidence.
 {¶ 32} "We review the alleged instances of ineffective assistance of trial counsel under *Page 11 
the two prong analysis set forth in Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, and adopted by the Supreme Court of Ohio in State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373. Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. Strickland, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. Id. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." (Internal citation omitted). State v. Mitchell, Montgomery App. No. 21957, 2008-Ohio-493, ¶ 31.
 {¶ 33} Crim. R. 29 provides, "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the * * * complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."
 {¶ 34} We agree with the State that "there was no reasonable likelihood that a motion for a directed verdict would have been granted." In other words, after the evidence on each side was closed, sufficient evidence, if believed, had been presented that Scott knowingly caused Harris to believe that he would cause her physical harm by means of his shovel and/or his firearm. Thus, counsel's failure to move for a directed verdict did not fall below an objective standard of reasonableness. There being no merit to Scott's third assignment of error, it is *Page 12 
overruled. Judgment affirmed.
WOLFF, P.J. and FAIN, J., concur.
Copies mailed to:
Stephanie L. Cook
C. Douglas Copley
 Hon. John S. Pickrel *Page 1